UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:

      Donghee Choi,                              Case No. 17-31540
                                             Chapter 7

                        Debtor.

---

Strategic Funding Source, Inc.                Adv. Pro. No. 18-50001

                        Plaintiff,
    v.

Donghee Choi

                        Defendant.

---

Appearances:

Jeffrey A. Dove, Esq.                      *for Plaintiff*
Barclay Damon LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, NY 13202

Craig C. Humpleby, Esq.                  *for Defendant*
Humpleby Law Office, P.C.
4306 East Genesee Street
Syracuse, NY 13214

2019 DEC 20  PM 3:57
CLERK OF THE
BANKRUPTCY COURT
N.D. OF NY
SYRACUSE
FILED

### Memorandum-Decision and Order

    Plaintiff Strategic Funding Source, Inc. ("Strategic Funding")[1] filed this adversary

proceeding to have its claim of $69,218.00 owed by Defendant-Debtor Donghee Choi ("Debt")

---

[1] Strategic Funding Source, Inc. is now doing business as "Kapitus" although it retains its formal incorporated name.

declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), (a)(4) and (a)(6).[2]

Plaintiff and Debtor stipulated to relevant material facts and joint exhibits.[3]  The court held an

evidentiary hearing on April 18, 2019.  David Wolfson, Vice President of Risk Management and

Asset Recovery for Plaintiff, testified as did Debtor.  Following the filing of post-trial briefs (Docs.

46, 47), the matter was deemed submitted.  For the reasons that follow, Plaintiff's claim of

$69,218.00 is found to be nondischargeable.

**Jurisdiction**

The court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1334(b), 157(a) and

(b)(1). This memorandum-decision and order incorporates the court's findings of fact and

conclusions of law as permitted by Fed. R. Bankr. P. 7052.

---

[2] In its Pre-Trial Statement, Plaintiff disclosed that it would not pursue its fifth claim to deny Debtor's discharge under 11 U.S.C. § 727(a)(2).  (Doc. 39).  Accordingly, that claim is not addressed and Debtor's fifth affirmative defense is rendered moot.

[3] Stipulation of Undisputed Facts (Doc. 37) ("Stip.") with attached exhibits 1-19 ("Ex.") that were admitted into evidence: Merchant Funding Application dated February 16, 2017 ("Application") ("Ex. 1"); Revenue Based Factoring Agreement dated February 17, 2017 ("First Factoring Agreement") ("Ex. 2"); February 20, 2017 Prefunding Call ("Ex. 3"); Revenue Based Factoring Agreement dated May 4, 2017 ("Second Factoring Agreement") ("Ex. 4"); May 5, 2017 Prefunding Call ("Ex. 5"); Northfield Partners LLC Contract Funding Summary ("Ex. 6"); Northfield Partners Merchant Statement of Activity ("Merchant Statement of Activity") ("Ex. 7"); Northfield Partners LLC's First National Bank Statements dated January to October, 2017 ("Northfield Bank Statements") ("Ex. 8"); Debtor's First National Bank Statements dated February to October, 2017 ("Ex. 9"); News Talk 1290 Article dated May 24, 2017 ("Ex. 10"); Times Record News Article dated May 26, 2017 ("Ex. 11"); Texas State Tax Lien dated February 17, 2017 ("February 17, 2017 Tax Lien") ("Ex. 12"); Texas Notice of Tax Due dated July 28, 2017 ("Ex. 13"); Letter from Attorney General of Texas to Donghee Choi dated November 3, 2017 ("Ex. 14"); Letter from Attorney General of Texas to Northfield Partners, LLC dated November 3, 2017 ("Ex. 15"); Northfield Partners, LLC Profit and Loss Statements from January 1, 2016 to June 7, 2018 ("Profit/Loss Statement") ("Ex. 16"); Debtor's 2016 Tax Returns ("Ex. 17"); Debtor's Schedules of Assets & Liabilities and Statement of Financial Affairs ("Ex. 18"); Debtor's Verified Answers to Plaintiff's First Set of Interrogatories, Requests for Production of Documents and Requests for Admission ("Ex. 19").

### Factual and Procedural History

Debtor is an entrepreneur who has worked in the fast food franchise business for over 20 years. Born, raised and educated in South Korea, Debtor obtained a Master of Business Administration ("MBA") before beginning work for Burger King. As part of his employment with Burger King, Debtor temporarily worked and trained in Los Angeles, California. Debtor immigrated to the United States in 2007 and the following year purchased his current residence in Manlius, New York on which Shinhan Bank America ("Shinhan Bank") holds a mortgage. Debtor successfully operated several Little Caesars pizza franchises throughout Central New York and managed 250 employees. He sold his pizza franchises to pursue operating Five Guys burger franchises in Texas. Debtor entered into an agreement with the Five Guys fast food burger chain and was given territorial rights over nine counties in Texas. Debtor formed Northfield Partners, LLC ("Northfield"), of which he is the sole member and sole officer, to operate Debtor's Five Guys restaurants. Northfield's first Five Guys restaurant opened in Wichita Falls, Texas in May 2016.

Northfield's first Five Guys restaurant was not as successful as had been expected. Debtor began to fall behind on his residential mortgage payments and in 2017 Shinhan Bank commenced a foreclosure action on its mortgage against Debtor's Manlius residence. Debtor contacted Plaintiff, a commercial lender that provides financing to small businesses. Debtor testified that he contacted Plaintiff to obtain funding for Northfield but also to catch up on his mortgage payments.

David Wolfson testified as to Plaintiff's business model and structure. Plaintiff provides commercial financing to small and medium-size businesses through factoring agreements, whereby Plaintiff purchases a company's future receivables at a steep discount for an agreed, fixed amount. The company repays the financed amount by regular, periodic payments that are debited

from its account.  Mr. Wolfson testified that Strategic Funding does not provide funding to consumers for personal use and that Plaintiff strictly reviews applications to ensure that funds are used for commercial and not personal purposes.  He further testified that Plaintiff reviews a company's financial records prior to providing funding to ensure that the company is still operating and able to repay the amount financed.

In February and May 2017, Debtor applied for and obtained two separate loans from Plaintiff on behalf of Northfield.  Debtor signed and executed on behalf of Northfield a Merchant Funding Application on February 16, 2017 ("Application") to obtain the first loan.  The Application contained a section stating, "Use of Funds: business debt consolidation." (Application, Ex. 1 at 1).  Debtor testified that he had a telephone conversation with Plaintiff's representative that day and, upon inquiring, was told that he could use the funds "for any purpose."  Plaintiff's representative was on his cellphone during that phone conversation.  Debtor provided bank and other financial records for Northfield, which, according to Mr. Wolfson's testimony, Plaintiff reviewed to ensure that Northfield was a legitimate company and that the funds would be used for business purposes.

The next day, Debtor signed and executed a Revenue Based Factoring Agreement ("First Factoring Agreement"), pursuant to which Plaintiff agreed to purchase $28,350.00 of Northfield's business receivables for $21,000.00, and Debtor agreed to have weekly payments of $1,382.93 debited from Northfield's account to satisfy the obligation. (First Factoring Agreement, Ex. 2 at 1).

The First Factoring Agreement contained certain representations and warranties by Northfield that it was not insolvent and had a continuing, affirmative obligation to advise Plaintiff of any material adverse change to Northfield's financial condition and operation. (First Factoring

4

Agreement, Ex. 2 Sections 2.1, 2.9).  As Northfield's principal, Debtor warranted that Northfield was in good standing, and that it was entering into the First Factoring Agreement "for business purposes and not as a consumer for personal, family or household purposes." (First Factoring Agreement, Ex. 2 Section 2.12).  A security agreement appended to the First Factoring Agreement contained a provision that the "Guarantor" (Debtor) agreed to guarantee "Merchant's" (Northfield's) compliance with the contract and that any future agreement between Plaintiff and Debtor would relate back to this agreement.  (First Factoring Agreement, Ex. 2 at 5, ¶¶ 3, 6, 11).

On February 17, 2017, the same day that Debtor signed the First Factoring Agreement, the State of Texas filed a tax lien against Northfield for unpaid sales taxes owing for the month of October 2016.  The lien was certified by the county clerk on February 23, 2017. (February 17, 2017 Tax Lien, Ex. 12 at 1-2).

Debtor participated in a pre-funding call on February 20, 2017.  (Stip. ¶5).  On the call, Debtor affirmatively stated that, at the time, he had no intention to file for bankruptcy and that Northfield was not behind on any of its financial obligations.  Debtor testified that there had been at least six other telephone conversations with Plaintiff's representative, including the call on February 16, 2017, in which Debtor inquired and was told he could use the funds "for any purpose."  Debtor subsequently requested recordings of these telephone conversations, which were not produced.  Mr. Wolfson testified that it was common for Plaintiff's employees to speak with potential clients over their personal cell phones, and that these conversations were not recorded.

Debtor agreed to open an account with First National Bank for the deposit of Northfield's receivables from which Plaintiff would debit the weekly payments ("Northfield Account").  (Stip. at ¶7).  Following the February 20, 2017 pre-funding call, Plaintiff wired the net amount after fees of $20,275.00 into the Northfield Account. (Northfield Bank Statements, Ex. 8 at 15; Stip. at ¶6).

Four days later, Debtor transferred $14,000.00 from the Northfield Account to his personal bank account. (Northfield Bank Statements, Ex. 8 at 19). At the hearing, Debtor testified that he used some portion of this transfer to make mortgage payments. For the next ten weeks, Plaintiff debited the weekly payments, leaving an outstanding balance as of May 4, 2017, of $14,520.70 that was owed on the First Factoring Agreement. (Merchant Statement of Activity, Ex. 7). Debtor proceeded to make four additional transfers from the Northfield Account to his personal account totaling $7,500.00. (Northfield Bank Statements, Ex. 8 at 28, 36-37, 44).

Debtor, on behalf of Northfield, contacted Strategic Funding for a second loan on May 3, 2017. (Stip. at ¶9). Pursuant to the May 4, 2017 Second Factoring Agreement, which Debtor signed on behalf of Northfield, Plaintiff agreed to purchase $70,500.00 of Northfield's receivables for $50,000.00 and Debtor agreed to have $1,480.00 debited weekly from the Northfield Account. (Second Factoring Agreement, Ex. 4 at 1; Stip. at ¶¶ 9-12). The Second Factoring Agreement contained representations and warranties identical to the First Factoring Agreement. It also provided that Debtor guarantee the obligations of Northfield to Strategic Funding. (Stip. at. ¶11). During the Second Factoring Agreement's pre-funding call on May 5, Debtor stated that Northfield was current with its taxes. When asked whether he expected tax liens to be filed against Northfield, Debtor qualified his response by stating: "not at this moment." Following the pre-funding call, Plaintiff wired $34,654.30 to Northfield. (Northfield Bank Statements, Ex. 8 at 40). This constituted the net amount of $50,000.00 less fees of $825.00 plus full repayment of the remaining $14,520.70 owed under the First Factoring Agreement.

On May 9, 2017, Debtor transferred $10,000.00 from the Northfield Account to his personal bank account. (Northfield Bank Statements, Ex. 8 at 45). At trial, Debtor admitted that some of these funds were diverted for personal use, including making mortgage payments on his

personal residence which was subject to foreclosure.  Debtor could not recall the exact date the
foreclosure action began but testified that his home was in foreclosure in early 2017 prior to the
second funding.  Debtor also made several other payments from the Northfield Account to pay
business expenses until the account was depleted.  (Northfield Bank Statements, Ex. 8 at 45).
Plaintiff successfully debited the first installment of $1,480.00 on May 14, 2017.  (Northfield Bank
Statements, Ex. 8 at 45; Stip. ¶13), which reduced Northfield's total debt to Plaintiff as of that date
to $69,218.00.

On or around May 24, 2017, the State of Texas executed its tax lien and seized personal
property including cash registers from Northfield's Five Guys restaurant in Wichita Falls.  This
crippled the restaurant's operations.  After that date, Plaintiff was no longer able to debit funds
from the Northfield Account as there were insufficient funds. (Northfield Bank Statements, Ex. 8
at 48-49; Stip. ¶14).

On July 28, 2017, the State of Texas issued a Notice of Tax and Fee Due by Northfield in
the amount of $15,584.28 covering the period from January 1 through April 30, 2017.  Debtor
testified that Northfield had paid a portion of the sales taxes during that period and the $15,584.28
was the remaining balance owed.  The State of Texas issued additional notices to Debtor and
Northfield for delinquent taxes on November 3, 2017.  (Ex. 14, 15).

Debtor filed for chapter 7 bankruptcy on November 13, 2017, listing Plaintiff as holding an
undisputed, unsecured claim in the amount of $69,218.00 that was not subject to offset.

### Discussion of Facts

Based on the evidence and testimony, the court finds that when Debtor contacted Plaintiff
to obtain funding, he intended to use the money, at least in part, to pay down the mortgage on his
personal residence.  This was contrary to his written representation to Plaintiff that the funding

7

would be used solely for Northfield's business purposes. Furthermore, Northfield was in default as to sales taxes owed to the State of Texas which Debtor knew at the time he obtained funding from Plaintiff. The court finds that Plaintiff would not have provided funding to Debtor had it known that Debtor intended to use the funds for personal use. The court accepts Mr. Wolfson's testimony that Plaintiff does not enter into financing agreements with or for customers who would use the funds for personal use. Plaintiff is a commercial finance institution, and provisions of the lending agreements emphasize this point. Northfield was identified as the "merchant" in the transaction, and Debtor was merely the guarantor. The Application and the First and Second Factoring Agreements all state that the funds are to be used solely for business purposes. As such, in conducting its due diligence, Plaintiff sought Northfield's business records, income and loss statements, bank accounts and tax information but did not seek information on Debtor's personal finances. Plaintiff lends to small businesses and not consumers and would not have lent money for a consumer seeking a loan for personal expenses.

The court rejects Debtor's assertion that he had Plaintiff's permission to use the funds to make personal mortgage payments, or that Plaintiff knew that Debtor would use the funds for personal use when Plaintiff provided the funding. Consumer finance is subject to a different set of rules and regulations and the court does not believe that this commercial lender would have altered its business model to accommodate this Debtor.

Debtor testified at trial that when he contacted Plaintiff to obtain funding in February 2017, he did so with the express intention of using some of the funds to make mortgage payments on his personal residence. Debtor's Statement of Financial affairs filed with his bankruptcy petition recites that a foreclosure action was filed in Onondaga County in 2017. Debtor testified that the action was filed in early 2017 and had already commenced by the time of the second funding.

Although the exact date of the filing is unknown, Debtor would have had advance notice to expect it. Debtor testified that in early 2017, he had come to an agreement with Shinhan Bank to make payments in order to keep his house. Only four days after Northfield received the first funding, Debtor withdrew $14,000.00 from the Northfield Account which he then deposited into his personal account in order to make mortgage payments. (Northfield Bank Statements, Ex. 8 at 19). Debtor similarly withdrew $10,000.00 from the Northfield Account only four days after Northfield received the second funding to make additional mortgage payments. (Northfield Bank Statements, Ex. 8 at 45). Debtor admits to making these withdrawals and payments.

In making the argument that he asked permission of Plaintiff's representative to use the funds to make mortgage payments, Debtor essentially admits that his underlying intention was to use the funds to make mortgage payments prior to the first funding. The timing of the mortgage foreclosure action, together with Debtor's subsequent withdrawals and payments, support finding that Debtor intended to use the funds to pay for his personal mortgage when he obtained both the February and May funding proceeds.

As noted previously, Debtor represented to Plaintiff that he would not use the funds for personal use. When Debtor signed the one-page Application, it clearly stated that the "Use of Funds" would be for "business debt consolidation." Debtor signed the First and Second Factoring Agreements which both stated, under a section entitled "Business Purpose," that the funds would be used for business purposes and not for "personal, family or household purposes." Not only did Debtor sign the First Factoring Agreement, but he also signed and initialed the Second Factoring Agreement, affixing his initials below this section on the same page. These are material representations that Debtor made to Plaintiff in order to obtain funding. As such, Debtor

represented to Plaintiff that he would not use the funds for personal purposes in stark contrast with his intent.

The court rejects Debtor's argument that Plaintiff gave its permission for Debtor to use the funds to pay his mortgage. Debtor testified that he had at least six telephone conversations with Plaintiff's employee in February 2017 prior to the first funding and specifically asked if he could use the funds "for any purpose." Taking Debtor's testimony at face value, Debtor never asked Plaintiff whether he could use the funding to pay the mortgage on his personal residence. Debtor, who holds an MBA, was mindful that Plaintiff is a commercial lender. The relevant agreements specified that the money could only be used for business purposes, and all of Debtor's discussions with Plaintiff's employees took place in the context of obtaining funding for a business. Therefore, any such statement that Debtor could use the funds "for any purpose" must, at best, be understood in that context, "for any legitimate business purpose." Debtor's testimony is both self-serving and unsubstantiated and, therefore, does little to show that Plaintiff permitted Debtor to use the funds to pay his mortgage. Debtor admitted that he did not expressly ask to use the funds to pay his mortgage and he never mentioned his mortgage to Plaintiff's representative. The court infers that Debtor intentionally crafted his question to be vague and misleading.

The court also rejects Debtor's argument that the transfers were a salary or dividends. Debtor stated that it was his routine practice that payments to himself not go through payroll processes but rather pass directly from the Northfield Account to his own personal account. However, Debtor admitted that he did not make these payments or transfers with the requisite tax forms or disclosures, including use of Forms W-2 or 1099. The timing of these payments is also suspicious in that Debtor made two large transfers—each only four days after obtaining the funds—and then admitted to using the funds to make mortgage payments. Debtor's bank

statements did not show regular payments from Northfield to himself absent these mortgage payments. Debtor's testimony that the transfers were a salary or dividends is self-serving, and the court interprets it as nothing more than a post hoc justification of under-the-table transfers from Debtor's business to himself. The court finds that the transfers were not a salary or dividend and instead constitute transfers which Debtor intentionally made to pay his mortgage.

Debtor's counsel suggested that Debtor did not understand the contract documents based on speaking English as a second language. The court rejects this argument. Debtor is a sophisticated business owner who has an MBA and has been working in the fast food franchise business for over 20 years. He owned and operated several franchises in New York and oversaw 250 employees. He had a strong command of the English language during his phone conversations with Plaintiff's representatives as well as during testimony. He was asked to verify his written statements, and responded clearly during the calls. The court finds that Debtor was a sophisticated and knowledgeable businessman who fully understood the contracts he signed and the statements he made.

The evidence shows that Northfield was not current on its taxes. The court finds that Debtor was aware of Northfield's outstanding sales tax obligations to the State of Texas, and knew that Northfield was in default. Debtor testified at trial that he understood that Northfield was required to file sales tax returns with the state on a monthly basis. Debtor further testified, however, that he was surprised when Northfield's property was seized in May 2017 because he thought he had additional time to pay the outstanding taxes. As a savvy businessperson, the court assigns little weight to this testimony. Debtor operated his previous franchises for many years in New York State. During that time, Debtor would have had to file and pay sales taxes for his businesses. Northfield was required under Texas law to file and remit sales taxes monthly. The

court finds that Debtor was fully aware of his tax obligations for his subsequent business in Texas. The State of Texas filed its tax lien on February 17, 2017 for unpaid taxes for the month of October 2016. The July 28, 2017 Notice of Tax/Fee Due also shows outstanding taxes for the period of January 1 to April 30, 2017. Debtor's failure to pay taxes on behalf of Northfield ultimately resulted in the tax being levied and the property seized in May 2017.

### Discussion of Law

To prevail on a claim of non-dischargeability under Section 523(a), Plaintiff must prove each element by a "preponderance of the evidence." *In re Scheller*, 265 B.R. 39, 51 (Bankr. S.D.N.Y. 2001) (citing *Grogan v. Garner,* 498 U.S. 279, 285 (1991)). It is generally held that exceptions to discharge must be rigorously construed against the creditor and in favor of the debtor to further the 'fresh start' policy of bankruptcy. *See Zohlman v. Zoldan*, 226 B.R. 767, 777 (S.D.N.Y.1998) and cases cited therein. The court shall apply this standard when considering the evidence in light of the claims pled.

### Plaintiff's Claim under 11 U.S.C. § 523(a)(2)(A)

Under Section 523(a)(2)(A), an individual debtor shall not be discharged, "from any debt— for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." Section 523(a)(2)(A) contains three independent causes of action—false pretenses, false representation, and actual fraud—each of which may be established by proof of the different elements. *In re Scialdone*, 533 B.R. 53, 58 (Bankr. S.D.N.Y. 2015). To be actionable, the debtor's conduct must involve moral turpitude or intentional wrong; mere negligence, poor business judgment or fraud implied in law is insufficient. *See In re Schwartz & Meyers*, 130 B.R. 416, 422 (Bankr. S.D.N.Y. 1991). The Supreme Court

has construed the terms in Section 523(a)(2)(A) to contain the "elements that the common law has defined them to include." *Husky Intern. Elecs., Inc. v. Ritz*, 136 S.Ct. 1581, 1586 (2016); *see also Field v. Mans*, 516 U.S. 59, 69 (1995).

*False Pretenses*

To prove that Debtor acted by false pretenses, Plaintiff must show: (i) an implied misrepresentation or conduct by the debtor, (ii) promoted knowingly and willingly, (iii) to create a contrived and misleading understanding of the transaction on the part of Plaintiff and (iv) which wrongfully induced Plaintiff to advance money, property, or credit to Debtor. *In re Henderson*, 423 B.R. 598, 621 (Bankr. N.D.N.Y. 2010) (citing *In re Gabor*, 2009 WL 3233907, at *4 (Bankr. S.D.N.Y. Oct. 8, 2009). The court finds that Plaintiff sustained its burden.

Debtor made an implied misrepresentation when asking Plaintiff's representative if he could use the funds "for any purpose" prior to the first funding. Debtor admitted that he never mentioned his true intention of using some of the funds to make mortgage payments, despite his prior written statements that the funds were to be used for "business debt consolidation" and not for "personal, family or household purposes." By his question, Debtor was implying that he would use the funds for any *business* purpose contrary to his true intent and, thus, created a misleading understanding of the transaction. That Debtor crafted his question to omit any mention of his mortgage payments, coupled with Debtor's own testimony that he contacted Plaintiff with the intention to use the funds in part for personal use, supports that Debtor intended to mislead Plaintiff. As a result, Plaintiff agreed to provide funding to Northfield.

*False Representation*

To prevail on a claim of false representation, Plaintiff must show: (i) Debtor made an express false or misleading statement, (ii) with the intent to deceive, (iii) on which Plaintiff

justifiably relied, (iv) in order to induce the creditor to turn over money or property to the debtor.

*Id.* (citing *In re Gabor*, 2009 WL 3233907 at *4; *Weiss v. Alicea,* 230 B.R. 492, 500 (Bankr. S.D.N.Y.1999)).

Debtor made an express and material misrepresentation that he was obtaining funding from Plaintiff to pay only business expenses when, in fact, he intended to use the funding proceeds to pay personal expenses including his personal mortgage payments.  Debtor did so by signing the Application and the First and Second Agreements, and by orally affirming his understanding of the contract terms during the first and second pre-funding calls.[4]  The court infers that Debtor did so with the intent to deceive.  Debtor confirmed that he intended to use some of the funding proceeds for personal use at the time he signed both Agreements and made mortgage payments with proceeds from the funding.  (First and Second Factoring Agreements, Ex. 1 and 2, Section 2.12; Requests for Admissions 10, 17).

The court finds that Plaintiff justifiably relied on Debtor's statements.   Section 523(a)(2)(A) does not require a showing of "reasonable" reliance, unlike Section 523(a)(2)(B), but the lesser standard of "justifiable reliance." *See Field*, 516 U.S. at 76-77.  The Supreme Court explained:

> The Restatement rejects a general, reasonable person standard in favor of an individual standard that turns on the particular circumstances, and it provides that a person is justified in relying on a factual representation without conducting an investigation, so long as the falsity of the representation would not be patent upon cursory examination.

*Field*, 516 U.S. at 60.

---

[4] Plaintiff pointed to eight alleged misrepresentations in its complaint referring to Section 523(a)(2)(A).  *See* Doc. 1 at 7-8.  Most of these statements "respect the debtor's or an insider's financial condition" and, therefore, fall outside of Section 523(a)(2)(A).  *See Lamar, Archer & Cofrin, LLP v. Appling*, 138 S.Ct. 1752, 1758 (2018).  Notably, each of these statements are omitted from Plaintiff's post-trial brief, except for Debtor's statement of intent to use the funds only for business purposes.  *See* Doc. 46 at 2-5.

Here, Debtor signed multiple sworn statements attesting to his intention to use the funds solely for business purposes.  Plaintiff possessed Northfield's business records and bank accounts, but a cursory examination of these documents would not have revealed Debtor's true intentions, as there is no mention of mortgage payments in the records which Debtor produced.  In addition to Debtor's multiple written acknowledgements, he also participated in two pre-funding calls where he again acknowledged his understanding of the loan agreements and made no mention of the desire to fund his mortgage payments.

The court finds that Plaintiff's and Debtor's ongoing business relationship weighs in favor of Plaintiff's argument that it justifiably relied on Debtor's statements.  By already reviewing and signing the documents once as part of the initial funding, Debtor demonstrated his familiarity with Plaintiff's business operations, policies and documents.  Debtor demonstrated his apparent compliance in paying back at least a portion of the first loan by weekly debits from the Northfield account.  At trial, Mr. Wolfson testified that Plaintiff was favorably disposed to grant Debtor the second funding based on Debtor's ostensible performance on the first funding.  Thus, Plaintiff's positive experience with Debtor encouraged Plaintiff to provide additional funding and a larger loan amount in May 2017.  The underlying misrepresentation that the funding would be used solely for Northfield's business purposes induced Plaintiff to approve the second funding.  Plaintiff has met its burden to establish the requisite elements of Section 523(a)(2)(A) as to the false representation.

*Actual Fraud*

Actual fraud, the third cause of action under Section 523(a)(2)(A), requires a plaintiff to show: (i) Debtor made a material false representation, (ii) Debtor made the representation knowing of its falsity, (iii) Debtor acted with intent to defraud Plaintiff, (iv) Plaintiff justifiably relied on

the false representation and (v) Plaintiff suffered damages that were the proximate cause of Plaintiff's reliance.  Restatement (Second) of Torts 1976 ("Restatement") §§ 525, 546 and 548A.

As stated, Debtor's written statements of intent on the Application and the First and Second Factoring Agreements, as well as his oral confirmation of the same, constitute material false representations.

The mental state required for actual fraud, *scienter*, is heightened as compared to the other two causes of action.  Scienter is more than mere intent and requires a "mental state embracing the intent to deceive, manipulate, and defraud." *See In re Bernard L. Madoff Inv. Sec. LLC*, 515 B.R. 117, 143 (Bankr. S.D.N.Y. 2014) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)).  "[A] permissive inference is almost a necessity when trying to establish scienter, since proof of a debtor's state of mind is, in most cases, not readily available." *In re Hanna*, 197 B.R. 413, 425 (Bankr. E.D.N.Y. 1996).  An inference of scienter can be derived from a totality of the circumstances. *Id.* (citing *In re Spar*, 176 B.R. 321, 328 (Bankr. S.D.N.Y. 1994)); *see also In re Balzano*, 127 B.R. 524, 531 (Bankr. E.D.N.Y. 1991) ("Fraudulent intent may be inferred; it cannot be presumed.").  However, "the permissible inference will be negated where the debtor comes forward with some evidence that he did not intend to deceive the Plaintiff." *In re Hanna*, 197 B.R. at 425 (citing *Spar,* 176 B.R. at 328).

Not only did Debtor expressly sign an agreement to only use the proceeds for business purposes, he also signed an identical agreement making the same representation in May 2017, even affixing his initials underneath the section warranting that the funds would be used solely for business purposes.  He made this representation after already receiving funds from Plaintiff and making a large transfer from the Northfield Account to his personal account.  Therefore, by the time of the second funding, Debtor had premeditated knowledge which strongly shows that Debtor

fully intended to use part of the funding proceeds for personal use. Equally compelling is the timing of the funding. In both instances where Plaintiff provided funding to Northfield, Debtor made large transfers from the Northfield Account to his personal account merely four days later. The evidence supports that Debtor would have had notice of the foreclosure prior to the first funding, and Debtor admitted that he approached Plaintiff with the intent to use some funds to pay Shinhan Bank. The court finds, therefore, that Debtor fully intended to use the money for mortgage payments when he requested funding in both February and May 2017.

Furthermore, a false representation as to a future action or promise can constitute scienter if the debtor had no intent to fulfill the promise at the time it was made. *See In re Demar*, 373 B.R. 232, 238–39 (Bankr. E.D.N.Y. 2007) (citing *Collier on Bankruptcy* ¶ 523.08[1][c] at 523–45). Debtor warranted that he would use the funds solely for business purposes. He had no intention to fulfill this promise based on his intention to use some of the proceeds for his mortgage payments. The fact that Debtor made these mortgage payments with the funding proceeds even though Northfield had outstanding tax debt shows that Debtor prioritized paying his personal liabilities over that of Northfield. This further supports a finding of fraudulent intent.

The court acknowledges that Debtor paid back the first loan and made a payment on the second loan. In general, when a debtor makes payments to a lender, courts will consider this evidence of a lack of fraudulent intent. *See e.g. In re Balzano* 127 B.R. at 531. However, the evidence does not vindicate Debtor of fraudulent intent. Here, the parties agreed that Debtor would create an account from which Plaintiff would automatically debit the loan repayment. (Stip. at ¶ 7). Through these automatic payments, Debtor paid back $13,829.30 of the initial loan with $14,520.70 remaining. The remainder of the initial loan was repaid when Debtor secured the second funding proceeds. (Stip. ¶¶ 11-12). Afterward, Debtor only made a single payment on the

second loan. (Stip. 13; Exhibit 7). When Debtor depleted the Northfield account, a substantial

$10,000.00 portion was moved to his personal account instead of being applied to business Debts.

(Northfield Bank Statements, Ex. 8 at 45). Debtor cannot successfully argue that he attempted to

pay back the second loan as evidence of his lack of fraudulent intent.

The court is mindful of the Supreme Court's decision in *Husky Intern. Elecs. Inc.*, where

the Court held that the term 'actual fraud' in Section 523(a)(2)(A) may encompass other forms of

fraud, like fraudulent conveyances, that can be effected without a false representation. *See Husky*

*Intern. Elecs. Inc.*, 136 S.Ct. at 1586. Such fraud may occur after the transfer giving rise to the

debt. *Id.* Here, in addition to his representations, Debtor diverted Northfield's funds to his

personal account to pay personal expenses. He did so notwithstanding the fact that Northfield had

outstanding liabilities at the time, including outstanding sales taxes.

Finally, Plaintiff shows that it suffered damages that were the proximate cause of its

reliance, and that Debtor induced Plaintiff to lend him money based on his false statement.

Proximate cause or "causation in fact" requires Plaintiff's reliance to be "a substantial factor in

determining the course of conduct that results in [their] loss." Restatement (Second) Of Torts §

546 (Restatement). The court finds that Plaintiff would not have provided the funding to Debtor

if it had known that he intended to use some of the funds for personal use. The evidence supports

the finding that Plaintiff lends to small businesses and not consumers and, therefore, would not

have extended credit for a personal loan. The court finds that Plaintiff has met its burden of

establishing actual fraud, rendering the Debt nondischargeable under Section 523(a)(2)(A).

The court rejects Debtor's first affirmative defense. Debtor's written and oral statements

took place prior to the funding, and the evidence shows that Plaintiff relied on them. Debtor's

statement of intent to use the funds solely for business purposes is not a statement respecting his

or Northfield's financial condition and, therefore, falls within Section 523(a)(2)(A). Debtor did not believe his statements to be true in that he intended to use some of the funds for personal use despite his statements to the contrary. To the extent that Debtor argues that Section 523(a)(2)(A) does not apply because he was not the direct recipient of the funds, this section does not require that the property be acquired by the debtor. "Courts generally conclude that when a debtor, through fraud, obtains some benefit, albeit an 'attenuated' one, from property or credit provided to a third party, he or she may not evade nondischargeability [under Section 523(a)(2)(A)] by claiming that he or she did not *directly* receive the benefit of the transaction." *In re Taylor*, 195 B.R. 624, 627 (Bankr. M.D.Pa. 1996).

The court also rejects Debtor's sixth affirmative defense, in which Debtor states that Plaintiff was "expressly unconcerned" with what Debtor did with the proceeds and was solely responsible for its own due diligence. The evidence shows that Plaintiff took adequate steps to ensure that its funding would not be used for personal use.

**Plaintiff's Claims Under 11 U.S.C. § 523(a)(2)(B), (a)(4) and (a)(6)**

In light of the court finding the Debt nondischargeable under Section 523(a)(2)(A), an extended analysis of the Debt being found nondischargeable under the remaining counts does not appear to be necessary. Nevertheless, the court shall summarize its findings that the evidence does not support finding the Debt nondischargeable under the remaining counts.

Under Section 523(a)(2)(B), an individual debtor will not receive a discharge, "from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—use of a statement in writing—(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable…reasonably relied; and (iv) that the debtor caused to be made or published with intent to

deceive…" 11 U.S.C. § 523(a)(2)(B). Plaintiff failed to show that Debtor made a written misrepresentation respecting Northfield's financial condition.

Debtor's statement that he intended to use the funds for business and not for personal use is not a statement "respecting" Debtor's or Northfield's financial condition. *See In re Wong*, 291 B.R. at 276. Even though Debtor misrepresented Northfield's tax obligations, Plaintiff fails to show that these statements were made in writing. *See In re Fanelli*, 263 B.R. 50, 60 (Bankr. N.D.N.Y. 2001). Although Debtor represented in writing that Northfield was not insolvent, the record was not sufficiently developed to establish that Northfield was, in fact, insolvent when the funding was released to Northfield. Furthermore, Debtor made that statement without any attempt to deceive. It was the subsequent execution of the tax lien that crippled Northfield's business operations. Without any evidence of Northfield's going concern value or the value of its other assets, the proof is lacking that Northfield's debts were greater than all of its assets at the time the funding was made or when Debtor diverted the funds for his personal use. *See In re Bruno Mach. Corp.*, 435 B.R. 819, 837–38 (Bankr. N.D.N.Y. 2010) (citing 11 U.S.C. § 101(32)(A)). Plaintiff fails to show that Northfield was generally not paying its liabilities as they became due. *See Tae H. Kim v. Ji Sung Yoo*, No. 18-1447, 2019 WL 2337018, at *3 (2d Cir. June 3, 2019) (citing N.Y. Debt. & Cred. Law § 271). The only evidence of delinquency was Northfield's failure to pay its sales tax.

Under Section 523(a)(4), a discharge under the Code, "does not discharge an individual debtor from any debt…for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).

The court rejects the claims for fraud and defalcation while acting in a fiduciary capacity because Debtor did not owe Plaintiff a fiduciary duty at the time of the funding or when Debtor

diverted funds for his personal use. *In re Scheller*, 265 B.R. 39, 52 (Bankr. S.D.N.Y. 2001) ("'Fiduciary capacity' as used in Section 523(a)(4) applies only to trusts existing prior to the wrongful conduct which created the debt."); *Zohlman v. Zoldan*, 226 B.R. 767, 772 (S.D.N.Y. 1998) ("'The broad, general definition of fiduciary, involving confidence, trust and good faith, is not applicable in dischargeability proceedings under § 523(a)(4)'; rather, for purposes of § 523(a)(4), who is a fiduciary 'is a matter of federal law.'"). Although Northfield ultimately became insolvent at some point after the execution of the tax lien, there was insufficient proof, as noted, that Northfield was insolvent at the time Debtor made the transfers of funds to his personal account. *See In Danzi*, No. 09-77669-DTE, 2010 WL 3811843, at *3 (Bankr. E.D.N.Y. Sept. 27, 2010); *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 94 N.Y.2d 541, 549 (N.Y. 2000).

The court also rejects Plaintiff's arguments as to embezzlement because Plaintiff lacks standing. A plaintiff has standing under Section 523(a)(4) only if the debtor committed larceny or embezzlement against property belonging to the plaintiff. *See, e.g., In re Razavi*, 539 B.R. 574, 600 (Bankr. N.D.Cal. 2015) ("To assert a claim for embezzlement, Plaintiff must have standing. Plaintiff must establish that Defendant embezzled property which belonged to Plaintiff."); *see also In re Vega*, 2012 WL 6021341, at *2 (Bankr. M.D.Fla. December 3, 2012). Plaintiff had no interest in the funding proceeds that were transferred. *See In re Algire*, 430 B.R. 817, 822 (Bankr. S.D. Ohio 2010) ("Once a lender transfers the loan funds, the lender typically loses control of those funds.").[5]

---

[5] The Supreme Court recognized in *Husky Intern. Elecs., Inc. v. Ritz*, 136 S.Ct. 1581 (2016), that a fraudulent transfer or conveyance could constitute "actual fraud" under Sections 523(a)(2)(A) or (a)(4). Here, there was no fraudulent transfer or conveyance by Debtor because Debtor did not transfer his own property and Northfield is not the debtor before the court.

Finally, Section 523(a)(6) excepts from discharge any debt, "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The court rejects this claim because Debtor's conduct was neither willful nor malicious. "Willful" denotes "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *In re McDermott*, 434 B.R. 271, 282 (Bankr. N.D.N.Y. 2010) (citing *Kawaauhau v. Geiger,* 523 U.S. 57, 61–2 (1998). "Malice" can refer to hatred, spite or ill-will, but can also exist where a debtor acts by fully expecting to harm the economic interests of a creditor and acts with conduct more culpable than reckless disregard. *See In re McDermott*, 434 B.R. 271, 283 (Bankr. N.D.N.Y. 2010); *In re Stelluti*, 94 F.3d 84, 87 (2d Cir. 1996). Here, Plaintiff fails to show that Debtor intended or expected to harm Plaintiff, nor can Plaintiff point to any spite or ill-will.

For the forgoing reasons, Plaintiff's claims under Sections 523(a)(2)(B), (a)(4) and (a)(6) shall be dismissed.

### Conclusion

The court finds the Debt nondischargeable under 11 U.S.C. § 523(a)(2)(A). The remaining claims shall be dismissed. A separate judgment shall be entered pursuant to Fed. R. Bankr. P. 7058.

So Ordered.

Dated:  December 20, 2019
           Syracuse, New York

Margaret Cangilos-Ruiz
United States Bankruptcy Judge